JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

### I. (a) PLAINTIFFS
Azzam Kadoura

**DEFENDANTS**
Harte-Hanks, Inc.,

(b) County of Residence of First Listed Plaintiff  Middlesex
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant  _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)
Paul F. Wood, Esquire, Law Office of Paul F. Wood, P.C., 45 Bowdoin Street, Boston, MA  02114, (617) 532-2666

Attorneys (If Known)

05cv10204 MLW

### II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government Plaintiff
☐ 2  U.S. Government Defendant
☒ 3  Federal Question (U.S. Government Not a Party)
☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

### III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

### IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 |  | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability |  | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other |  | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability |  |  | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise |  |  | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☒ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General |  | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty |  | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other |  |  | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights |  |  | ☐ 950 Constitutionality of State Statutes |
|  | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition |  |  |  |

### V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

### VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
42 U.S.C. 2000e, et seq.
Brief description of cause:
Employment discrimination and retaliation

### VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes   ☐ No

### VIII. RELATED CASE(S) IF ANY
(See instructions):  JUDGE _____  DOCKET NUMBER _____

DATE _____   SIGNATURE OF ATTORNEY OF RECORD _____

**FOR OFFICE USE ONLY**

RECEIPT # ____  AMOUNT ____  APPLYING IFP ____  JUDGE ____  MAG. JUDGE ____

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1. Title of case (name of first party on each side only) Azzam Kadoura v. Harte-Hanks, Inc.

2. Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet. (See local rule 40.1(a)(1)).

   ☐ I. 160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT.

   ☑ II. 195, 368, 400, 440, 441-444, 540, 550, 555, 625, 710, 720, 730,   *Also complete AO 120 or AO 121
       740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.        for patent, trademark or copyright cases

   ☐ III. 110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
       315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
       380, 385, 450, 891.

   ☐ IV. 220, 422, 423, 430, 460, 510, 530, 610, 620, 630, 640, 650, 660,
       690, 810, 861-865, 870, 871, 875, 900.

   ☐ V. 150, 152, 153.

   [stamp: 05cv10204 MLW]

3. Title and number, if any, of related cases. (See local rule 40.1(g)). If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.

4. Has a prior action between the same parties and based on the same claim ever been filed in this court?
   YES ☐   NO ☑

5. Does the complaint in this case question the constitutionality of an act of congress affecting the public interest? (See 28 USC §2403)
   YES ☐   NO ☑

   If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?
   YES ☐   NO ☐

6. Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?
   YES ☐   NO ☐

7. Do all of the parties in this action, excluding governmental agencies of the united states and the Commonwealth of Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).
   YES ☐   NO ☑

   A. If yes, in which division do all of the non-governmental parties reside?
      Eastern Division ☐   Central Division ☐   Western Division ☐

   B. If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?
      Eastern Division ☑   Central Division ☐   Western Division ☐

8. If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court? (If yes, submit a separate sheet identifying the motions)
   YES ☐   NO ☐

(PLEASE TYPE OR PRINT)
ATTORNEY'S NAME  Paul F. Wood
ADDRESS  Law Office of Paul F. Wood, P.C., 45 Bowdoin St., Boston, MA 02114
TELEPHONE NO.  (617) 532-2666

(Coversheetlocal.wpd - 10/17/02)

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FILED
IN CLERKS OFFICE

2005 FEB -2 P 12: 15

Azzam Kadoura, )
 )    05 ACTION NO. 10204 MLW
 Plaintiff, )    RECEIPT #
 )    AMOUNT $ 150.00
vs. )    SUMMONS ISSUED 1
 )    LOCAL RULE 4.1 —
Harte-Hanks, Inc. d/b/a )    WAIVER FORM —
 Harte-Hanks Data Technologies, )    MCF ISSUED —
 )    BY DPTY. CLK. M.P.
 Defendants. )    DATE 2/2/05

COMPLAINT AND DEMAND FOR TRIAL BY JURY
MAGISTRATE JUDGE JGD

## Jurisdiction

1.  Jurisdiction of Count I is conferred by 28 U.S.C. 1331, as this Count arises under the laws of the United States.

2.  Jurisdiction of Counts II and III is conferred by pendent and/or supplemental jurisdiction pursuant to 28 U.S.C. 1367.

3.  Jurisdiction of all Counts is conferred by 28 U.S.C. 1332, as there is a complete diversity of citizenship between the Parties, and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

## Parties

4.  The Plaintiff, Azzam Kadoura ("Kadoura"), is a citizen of the Commonwealth of Massachusetts, Middlesex County.

5.  The Defendant, Harte-Hanks, Inc. d/b/a Harte-Hanks Data Technologies ("Harte-Hanks"), is a for-profit corporation with a principal place of business in San Antonio,

Texas.

## Factual Allegations

6.  Kadoura is an Muslim American citizen of Palestinian national origin.

7.  On or about September 8, 1998 Kadoura commenced employment with Harte-Hanks as a Software Release Engineer in Harte-Hanks' Billerica, MA facility.

8.  From the commencement of his employment up until early 2004, Kadoura received nothing but favorable performance reviews and feedback from his superiors, and had not been subject any disciplinary measures whatsoever.

9.  In or around the late Summer of 2003 Kadoura installed some computer software at the work station of Audrey Kidas, Senior Director of Product Management.

10. At all times relevant herein, Kidas was/is a supervisory/managerial employee with Harte-Hanks.

11. Kidas is Jewish.

12. Up until this time, Kadoura had enjoyed a congenial working relationship with Kidas.

13. During the installation, Kidas and Kadoura engaged in small talk, and during the course of the conversation Kadoura inquired about Kidas' plans for the upcoming weekend.

14. Kidas responded that she was going to Israel and further stated that people thought she was "crazy" for going with everything that was happening with the bombings and killings, but that she had to go for a wedding.

15. Kadoura then stated that Israel was a very beautiful country and that his parents had been born in Safad, a city in northern Israel.

16. Kidas continued to talk about the violence in Israel, then making disparaging remarks concerning the Palestinian people, stating that they have a lot of children, become poor, cannot support them, the kids have no future and "they revert to violence."

17. Kidas further stated that other Arab countries should take them, and that since the Palestinians are "Arabs", that they should leave Israel and go to Jordan or Lebanon.

18. Kadoura was shocked by Kidas' comments and left her office as soon as he finished his work.

19. Kadoura informed several coworkers about Kidas' comments, but did not contact human resources or his immediate supervisor at the time for fear of retaliation.

20. After returning from her trip to Israel, Kidas stopped speaking to Kadoura unless absolutely necessary, stopped saying hello to or acknowledging him in the halls, ignored or spoke over him at meetings, and otherwise treated him far differently than prior to their above conversation. Kidas did not treat Kadoura's non-Palestinian and/or non-Muslim coworkers in this manner.

21. In or around February, 2004 Kadoura was assigned to a project supervised by Kidas.

22. Upon information and belief, Kidas had specifically requested from Kadoura's immediate supervisor, Praveen Patnaik, Senior Director of Development, that Kadoura be assigned to her project.

23. From the commencement of Kadoura's work on the project, Kidas unfairly criticized his work, ignored his input and suggestions, and otherwise treated him disparagingly as compared to his non-Muslim and/or non-Palestinian coworkers on the project.

24. In or around March, 2004 Kidas complained (falsely) to Patnaik concerning Kadoura's

alleged conduct on the project.

25. Patnaik then came into Kadoura's office and berated him for his alleged conduct.

26. Kadoura responded by explaining to Patnaik that his conduct on Kidas' project had been proper, informed him of Kidas' above discriminatory comments, her conduct towards him after her return from Israel, and her treatment of him since being assigned to work under her.

27. Kadoura further stated to Patnaik that Kidas was treating him in this fashion because of his religion and national origin, and pleaded with Patnaik to take appropriate action.

28. Patnaik responded that Kidas was not prejudiced, refused to take any prompt, remedial or effective action to curtail her conduct, and told Kadoura to "get off it."

29. In or around April, 2004 Kadoura was in the office of a fellow employee, who happed to be Jewish, when David Siesle, Vice President of Products and Systems Development at Harte-Hanks, came into the office.

30. Siesle was/is both Kidas and Patnaik's supervisor.

31. Siesle is also Jewish.

32. During the conversation, Siesle told Kadoura and the other employee that he had previously worked in Turkey. He then made disparaging remarks concerning the Muslims in Turkey, stating, among other things, that they marry multiple women.

33. As an attempt to change the subject, Kadoura asked Siesle if he had ever visited the area of Turkey near the Syrian border, stating that it was a very beautiful part of the country.

34. Siesle began to laugh.

35. Kadoura asked Siesle why he was laughing, and he responded by asking what would

happen if he took Kidas and the Jewish employee who was present to Syria, referring to them as "three Jews."

36. Kadoura stated nothing would happen, and informed him that his wife is Jewish, that his children are considered Jewish, and that they had visited Syria on several occasions without any problems whatsoever. Siesle's comments had made Kadoura very uncomfortable, and he left the office as soon as possible.

37. On or about May 26, 2004 Kadoura was given a "Formal Warning" by Patnaik. The alleged reasons for the warning were false and a pretext for unlawful discrimination and retaliation.

38. Kadoura stated to Patnaik that this disciplinary action was the result of Kidas' discriminatory conduct towards him, Patnaik once again told him to "get off it", and otherwise refused to take any prompt, remedial or effective action regarding his complaints.

39. As part of the warning, Kadoura was placed upon probation and given a set of performance goals to meet. Kadoura met all of the goals in the allotted time and Patnaik stated that he was "satisfied" with the same.

40. On or about June 2, 2004 Kadoura contacted David Lobley from Harte-Hanks Human Resources Department.

41. Kadoura related the above conduct to him, including Kidas' statements and actions towards him, Siesle's comments, and the false pretextual reasons for placing him on the performance improvement plan.

42. Lobley called Kadoura at home that night and directed him not to return to work until

further notice.

43. Kadoura was then called to come into work on June 8, 2004 to meet with Patricia Clark, Vice President of Human Resources. Lobley was also present at the meeting.

44. At this meeting Kadoura was given another written warning, this one concerning alleged inappropriate remarks that *Kadoura* had made. These allegations were completely false and a further pretext for unlawful discrimination and retaliation.

45. At the meeting, Clark further stated to Kadoura that Kidas, Siesle and Patnaik "don't deny" Kadoura's above allegations. Clark further stated to Kadoura, "Nobody's denying what happened."

46. Despite these admissions, Kadoura was given the above false warning and required to stay on the performance improvement plan.

47. As with Kadoura's previous warning, this warning was false and a pretext for unlawful discrimination and retaliation.

48. On or about July 27, 2004 Kadoura was given a performance review, with Patnaik and Lobley present.

49. During this review, Kadoura was again told by Patnaik that he was performing up to expectations, but nevertheless his probationary period was extended. The alleged reasons for extending Kadoura's probation were false and a pretext for unlawful discrimination and retaliation.

50. The following day, Kadoura met privately with Patnaik. Kadoura stated to him that the reasons for placing him on the latest performance improvement plan were false and unfair. Kadoura also reminded him that he had previously requested a three week

vacation to visit his dying aunt and ailing mother in Syria.

51. Approximately two hours later, Kadoura was called at home by Lobley and told that he had threatened Patnaik during their above meeting and that he was being suspended for that reason. Once again, this allegation was completely false and a pretext for unlawful discrimination and retaliation.

52. Patnaik had falsely stated to at least one other person that Kadoura had verbally and physically threatened him.

53. On or about July 29, 2004 Patricia Clark called Kadoura at home and terminated his employment with Harte-Hanks for "insubordination" concerning his alleged conduct in the meeting with Patnaik. As with the above conduct taken against him, the stated reason for Kadoura's termination was completely false and a pretext for unlawful discrimination and retaliation.

54. In a letter dated that day, Clark stated that Kadoura was being terminated because "Harte Hanks has a zero tolerance for workplace violence" and that remarks he allegedly made to Patnaik fell into that category. Again, these allegations were completely false and a pretext for unlawful discrimination and retaliation.

55. Shortly after his termination, Harte-Hanks falsely stated in at least one written communication to a third person that Kadoura was "Discharged for deliberate misconduct or violation of company rules or policy ...." Harte-Hanks additionally falsely stated in this written communication that Kadoura "had made threatening remarks to his supervisor."

56. At all times during his employment with Harte-Hanks, Kadoura performed his job in an exemplary manner and otherwise met and/or exceeded the legitimate performance

expectations for his position.

57. The above acts and/or omissions of Harte-Hanks and its authorized and apparent agents, have directly and proximately caused Kadoura to suffer lost income and diminished earning capacity, personal injury including emotional distress, and to otherwise be damaged.

## COUNT I
### Title VII Of the 1964 Federal Civil Rights Act, as Amended
### 42 U.S.C. 2000e, et seq.

58. The Plaintiff adopts by reference all above allegations, and further alleges:

59. All conditions precedent regarding this Count have been complied with.

60. The above described acts of discrimination against Kadoura on the basis of national origin and religion had the purpose or effect of injuring him in the terms and conditions of his employment.

61. The above described acts of discrimination had the purpose or effect of unreasonably interfering with Kadoura's work performance or creating an intimidating, hostile, or offensive working environment.

62. Kadoura was additionally subject to retaliation for opposing unlawful discrimination and/or for otherwise asserting rights under this section.

63. Defendant's stated conduct was willful, malicious, in bad faith, outrageous, and/or extraordinary, thereby giving rise to an award of punitive damages.

WHEREFORE, the Plaintiff, Azzam Kadoura, demands judgment against Harte-Hanks in an amount reasonably calculated to adequately compensate him for his injuries, together with punitive damages, interest, reasonable attorney's fees, and the costs of this action.

## COUNT II
### Mass.G.L. c. 151B

64. The Plaintiff adopts by reference all above allegations, and further alleges:

65. All conditions precedent regarding this Count have been complied with.

66. The above described acts of discrimination against Kadoura on the basis of national origin and religion had the purpose or effect of injuring Kadoura in the terms and conditions of his employment.

67. The above described acts of discrimination had the purpose or effect of unreasonably interfering with Kadoura's work performance or creating an intimidating, hostile, or offensive working environment.

68. Kadoura was additionally subject to retaliation for opposing unlawful discrimination and/or for otherwise asserting rights under this section.

69. Defendant's stated conduct was willful, malicious, in bad faith, outrageous, and/or extraordinary, thereby giving rise to an award of punitive damages.

WHEREFORE, the Plaintiff, Azzam Kadoura, demands judgment against Harte-Hanks in an amount reasonably calculated to adequately compensate him for his injuries, together with punitive damages, interest, reasonable attorney's fees, and the costs of this action.

## COUNT III
### Defamation

70. The Plaintiff adopts by reference all above allegations, and further alleges:

71. The above written and oral publications made by Harte-Hanks supervisory and managerial employees were adopted, authorized, and/or ratified by Harte-Hanks and were defamatory in that the same tended to hold Kadoura up to contempt, hatred, scorn, and/or ridicule, and further tended to impair Kadoura's standing in the community, the workplace, and elsewhere.

72. Harte-Hanks had actual and constructive notice of these publications at all times relevant herein.

73. The above stated written and oral communications made by Harte-Hanks were of and concerning Kadoura because they referred to Kadoura or because said publications could reasonably be interpreted as referring to Kadoura.

74. The above publications of and concerning Kadoura were false, known to be false and/or made with reckless disregard as to the truth or falsity of the said publications, and/or there was no legitimate justification, business or otherwise, for the said publications.

75. The above publications were slanderous *per se* because they accused Kadoura with criminal wrongdoing and/or because the said publications otherwise prejudiced Kadoura in his business because they expressly and impliedly imputed that he was unfit for his full employment privileges.

WHEREFORE, the Plaintiff, Azzam Kadoura, demands judgment against Harte-Hanks in an amount reasonably calculated to adequately compensate him for his injuries, together with interest and the costs of this action.

**PLAINTIFF DEMANDS TRIAL BY JURY ON ALL COUNTS**

Respectfully submitted,
Azzam Kadoura
By his attorney,

_____
Paul F. Wood, BBO No. 565195
Law Office of Paul F. Wood, P.C.
45 Bowdoin Street
Boston, MA 02114
(617) 532-2666